Filed 9/29/21  In re Henry CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re ROBERT HENRY, on Habeas Corpus. | A160596 (Solano County Super. Ct. Nos. VC19726 & FCR333123) |

## I. INTRODUCTION

Robert Henry, who was convicted of the murder of Andre Johnson in 1986, has filed a habeas petition seeking relief based on newly discovered evidence (Pen. Code, § 1473, subd. (b)(3)) and false evidence (*id*., subd. (b)(1)).[1]  His conviction carried a special circumstance finding that the murder was intentional and committed for financial gain.  (§ 190.2, subd. (a)(1).)  Henry was sentenced to life imprisonment without the possibility of parole (LWOP).  This court affirmed the conviction in a 1988 unpublished opinion.  (*People v. Henry* (Sept. 21, 1988, A035447) [nonpub. opn.].)  As we recently outlined in an unpublished opinion affirming the denial of Henry's petition for resentencing under section 1170.95: "The prosecution's theory at trial was that Henry hired Francis Lee Brewer to kill Cedric Turner (who Henry believed had participated in a robbery of Henry), and Brewer instead shot and killed Johnson, believing Johnson to be Turner.

---

[1] Undesignated statutory references are to the Penal Code.

1

The prosecution argued Henry was guilty of aiding and abetting the murder of Johnson on a transferred intent theory." (*People v. Henry* (Feb. 26, 2021, A158921) [nonpub. opn.].)

In this, the most recent of five habeas petitions Henry has brought collaterally attacking his conviction, we are presented with eight claims alleging newly discovered evidence in the form of (1) witness testimony given at proceedings after Henry's trial, and (2) a recently enhanced audio recording of a witness interview. Henry contends the new evidence shows "that, contrary to the testimony presented at [Henry's] trial, Brewer was not the one who shot and killed Johnson but that the murder was committed by Bernard Oden, and was perpetrated for a reason other than an agreement with [Henry] to kill Turner." Henry also argues the new evidence (contradicting testimony given at his trial) shows the trial testimony was false. He states: "The false evidence consists of testimony at [Henry's] trial that Brewer had done the shooting and that [Henry] had admitted hiring Brewer to murder Turner but Brewer killed the wrong man."

The Attorney General filed an informal response arguing that we should deny relief summarily on the ground that Henry's claims are untimely. We agreed in part but issued an order to show cause directed to certain portions of the petition. In our order to show cause, we ordered supplemental briefing on specific issues concerning the timeliness of some of Henry's claims, and gave the parties the option to stand on their initial pleadings in lieu of filing a formal return and traverse. The parties having filed the requisite supplemental briefs and having elected to stand on their initial pleadings in lieu of filing a formal return and traverse, we heard argument on August 10, 2021, and took the cause under submission. The order to show cause denied relief as to some of Henry's claims. We now deny relief as to the remainder of the claims.

2

## II. BACKGROUND

To establish the baseline context, we quote from our unpublished decision filed September 21, 1988 (with appropriate bracketed adjustments) as follows:

The conviction at bench grew out of the killing of Andre Johnson who was shot from a passing car driven by Francis Lee Brewer (Brewer), a hired killer. The murder took place on Thanksgiving Day, 1985, in the vicinity of Country Club Crest in northern Vallejo and involved numerous members of the Henry and Taggart families, including [Henry], [his three brothers Gary and John Henry and Jeffrey Taggart (Jeffrey); as well as his cousins Jester Taggart (Jester) and Alex Taggart]. Stated most favorably to respondent as it must [be] (*People v. Johnson* (1980) 26 Cal.3d 557, 576; *People v. Mosher* (1969) 1 Cal.3d 379, 395, disapproved on other grounds in *People v. Ray* (1975) 14 Cal.3d 20, 30–31) the evidence reveals the following scenario.

At about 3 a.m. on November 28, 1985, Cedric Turner, the intended victim of the crime [(Turner)], stood at the corner of Gateway and Rounds Streets in the Country Club Crest area in Vallejo. Wyatt Shellmon came along in his car and asked Turner if he could get some "base rocks"[2] for him. After a yes answer, Shellmon picked up Turner and drove him to Sawyer Street to contact [Henry] who was selling cocaine. Moments later, [Henry] got into Shellmon's car. All three were heading towards the end of an isolated cul-de-sac in a remote area of the city. Shellmon suddenly stopped, pulled a gun and pointing it at [Henry] said, "Give me everything you have or I'll blow your head off." [Henry] complied by giving up $30 in cash and some cocaine. Shellmon then ordered [Henry] out of the car and shortly thereafter dropped off Turner as well.

---

[2] "Base rock" is a street term for cocaine.

Following the robbery, [Henry], Jeffrey and Jester met at [Henry]'s house to discuss retaliation against Turner. After hearing [Henry] recount that Turner had robbed him by putting a gun at his head, they unanimously decided to shoot (get) Turner.

For the apparent purpose of carrying out the plan, [Henry] during late afternoon arranged a meeting with Bernard Oden and the latter's friend, Brewer. At the meeting which took place in his house, [Henry] complained that he had been robbed of $400 at gunpoint and offered two "hubbas" (rock cocaine) to Brewer to give Turner "a good ass whipping." Brewer fully understood the true meaning of [Henry]'s request. Immediately following the discussion, Brewer went to his girlfriend's house on Stella Street, picked up a .22 caliber sawed-off rifle and ammunition, loaded the gun with bullets, placed it in the blue Plymouth he had stolen earlier and took off to Gateway Drive, the scene of the shooting.

Around 6 p.m. that evening, [Henry] and Jester confronted Turner on Gateway Drive and told him they were going to "take him out" and he "was gonna die." The duo then left and returned with Jeffrey, all three carrying guns. [Henry] came face to face with Turner and repeated his threat that Turner was going to die. By now a crowd had gathered and Turner retreated to the driveway of the Morgan residence at Gateway. Jester, with [Henry] standing close by, urged the crowd to move because "somebody's going to get shot."

Turner fled inside the house. Andre Johnson was also there and after listening to Turner's description of what was going on said: "Come on, we'll handle it" and offered to give Turner a ride home. They walked outside together. As Turner walked over to Johnson's car and occupied the front passenger seat, the crowd asked Johnson why he was helping Turner, instead of letting him fight his own battles. Johnson threatened them back shouting

4

that he and his brother would come back and tear up the place. Simultaneously Johnson and [Henry] were yelling and pushing each other; Johnson called [Henry] "wave set" an obvious slur on [Henry]'s permed hair.

Meanwhile, Brewer and Oden arrived at the scene in the blue Plymouth and parked in front of Johnson's car. Brewer got out of the car and stood on the sidewalk observing the argument between [Henry] and Johnson. [Henry] walked up to Brewer and pointed out Turner to him by saying: "That's the guy."

Thereafter, Brewer, with Oden as his passenger sitting in the front seat, drove down the street, made a U-turn and slowed down or stopped in the middle of the street next to Johnson's car. As Jester yelled "watch out, he's gonna shoot," Brewer leaned across Oden and fired numerous shots out of the passenger window of the car hitting and killing Johnson who was standing approximately 5 to 10-feet away. The evidence overwhelmingly demonstrates that at the time of the shooting Johnson was reaching for the door of his automobile and was facing toward the crowd in the street rather than the blue car from which the shots were coming.

After the shooting, Brewer disposed of the murder weapon, wiped the fingerprints off the blue Plymouth and abandoned the car. Then, accompanied by Oden, he returned to the crime scene to ascertain if the victim had been shot. As a next step, Brewer, Oden and Jeffrey went to [Henry]'s house on Sawyer Street. In the ensuing discussion, Brewer assured [Henry] that he had taken care of the job and that [Henry] did not have to worry any more. [Henry] indicated that he was willing to pay but added since Brewer had killed the wrong man, the original price would be reduced

5

in half from $200 to $100.[3]  The fact that the Johnson killing occurred as a result of an agreement to kill Turner, was further corroborated by [Henry] himself.  The record reflects that after his arrest for the Johnson homicide [Henry] stated to Detective Bawart:  "I hired Lee Brewer to kill Cedric Turner.  He killed the wrong guy.  I can't understand why I'm being charged."

The thrust of [Henry]'s defense was that Brewer killed Johnson based on an independent motive.  Under this hypothesis, since Brewer did not mistakenly or inadvertently shoot Johnson while intending to shoot Turner, the doctrine of transferred intent could not be applied to convict [Henry].  In support of this theory a defense criminalist testified that the angles and the bullet trajectories indicated that Johnson was the intended target and that he was struck while on the ground or falling towards the ground.  The defense also examined a psychologist who administered an "I.Q." test to [Henry].  According to his testimony, [Henry]'s "I.Q." was at 75 which constituted borderline mental deficiency.

Based upon the foregoing evidence, [Henry] was convicted of first degree murder (Pen. Code, [footnote omitted] § 187) under the theories of

---

[3] The pertinent part of the record reads as follows:  "Q. What happened the second time you'd been there now after the shooting, what took place?  [¶] A. Just—Lee told—Lee Francis [Brewer] told him, Robert Henry that, uh, <u>he had tooken care of that</u>.  [¶] Q. And what was said to him by Mr. Henry?  [¶] A. He told him that he didn't have that right now, but he could come back later and he would give it to him.  [¶] Q. Then what happened?  [¶] A. Uh, shortly after that, asked exactly what happened.  He said, '<u>You don't have to worry about him no more</u>.'  [¶] Q. Who asked that?  [¶] A. He asked Lee. [¶] Q. When you say 'he,' who are you referring to?  [¶] A. Robert Henry.  [¶] Q. Asked him what?  [¶] A. Exactly what had happened, and Lee told him, replied to him, '<u>Well, you don't have to worry about him no more</u>. . . .' "  [¶] "Q. And did they discuss the payment?  [¶] A. Yes.  They indicated that, because he had hit—shot the wrong man, that he was only going to pay half of the moneys; instead of paying $200, he was going to be paid only 100."  (Emphasis added.)

aider and abettor and transferred intent.  The jury found the special circumstance allegation of intentional murder for financial gain (§ 190.2, subd. (a)(1)) and the firearm use allegation (§ 12022, subd. (a)) to be true. [Henry]'s motion for a new trial and/or to dismiss the special circumstance finding was denied, and he was sentenced to [LWOP].

[We end our quotation from *People v. Henry*, *supra*, A035447.]

## A. *Henry's Habeas Corpus Petition*

Summarized generally, the petition before us alleges the following new evidence surfaced in proceedings that followed Henry's trial:  (1) Evidence that Bernard Oden (the passenger in the car driven by Brewer), rather than Brewer, shot and killed Johnson.  Henry argues this evidence conflicts with the prosecution's theory that Henry is guilty on a transferred intent theory because he hired Brewer to kill Turner.  (2) Evidence that, whether Brewer or Oden was the shooter, each had his own reasons to shoot Johnson, such as Johnson's belligerent manner at the scene or his displaying of a gun.  Henry argues this evidence conflicts with the theory that Johnson was shot pursuant to an agreement between Henry and Brewer to kill Turner. (3) Evidence that Brewer would not have mistaken Johnson for Turner. Henry argues this evidence undercuts the prosecution theory that Brewer shot Johnson by mistake as he attempted to fulfill his agreement with Henry to shoot Turner.

## B. *Henry's Specific Allegations of Newly Discovered Evidence*

Summarizing the petition somewhat more specifically in order to frame the issues we will be addressing here, we note that Henry alleges the following new evidence and further alleges he discovered it in the following circumstances.

First, two of Henry's alleged accomplices—his cousin Jester and the alleged shooter Brewer—were tried in connection with Johnson's murder.

7

Jester was tried in 1986 shortly after Henry's trial, and Brewer's trial began near the end of 1987 and concluded in early 1988. Some of the testimony at those trials differed from the testimony at Henry's trial.[4] In particular, Henry's brother Jeffrey (who was given immunity) gave different accounts at the three trials: (1) Jeffrey testified at Henry's trial that he was standing on the street, saw that the shots came from the car driven by Brewer and was sure the passenger fired them; (2) Jeffrey testified at Jester's trial that he was standing on the street and saw that Oden fired the shots; and (3) Jeffrey testified at Brewer's trial that he (Jeffrey) was in the car with Brewer and Oden, and he saw Oden fire the shots. The jury at Brewer's trial found him guilty of second degree murder and found he did not personally use a firearm.

Second, Henry sought federal habeas relief and initially suffered a denial, but obtained an order on appeal to the Ninth Circuit remanding the proceeding for an evidentiary hearing. (*Henry v. Marshall* (9th Cir. 2007) 224 Fed. Appx. 635, 636–637.) On remand, the federal district court referred the case for an evidentiary hearing before a magistrate judge. (See *Henry v. Marshall* (E.D. Cal., May 27, 2010, No. CIV S-94-0916 JKS EFB P) 2010 U.S. Dist. LEXIS 52192, p. *10.) At that evidentiary hearing in 2009, Brewer testified that Henry did not hire him, or offer him money or drugs, to kill or

---

[4] This court previously granted Henry's request for judicial notice of certain records from prior and related proceedings, while denying his request as to other records that were not available to this court (without prejudice to the ability of the parties to submit, and ask this court to take judicial notice of, additional relevant records).

Henry has now submitted a request that this court take judicial notice of additional materials, specifically partial reporter's transcripts from Henry's and Jester's trials. We grant that second request to the extent it pertains to the partial transcripts of Jester's trial. We deny the second request as it pertains to partial transcripts of Henry's trial, because this court (in response to Henry's first judicial notice request) has already taken notice of a more complete set of those transcripts that was filed in one of Henry's recent appeals.

hurt Turner. Brewer testified that Oden shot Johnson. Brewer testified he was familiar with both Johnson and Turner, although he had met Johnson once and had not met Turner. He testified he would not have mistaken one of them for the other. Henry's brother Jeffrey testified he was in the car with Brewer and Oden, and that Oden shot Johnson. Henry testified that, after he was robbed, he discussed retaliating against Turner with his brother Jeffrey and their cousin Jester. But they only discussed beating Turner up, not shooting or killing him. Henry said he jokingly said to Brewer he would give him some cocaine if he helped beat up Turner. In May 2010, the magistrate judge issued a detailed decision recommending the denial of relief and finding the new evidence supporting Henry's innocence claim was not credible. (*Henry v. Marshall*, *supra*, 2010 U.S. Dist. LEXIS 52192, at p. *81.) And in September 2010, the federal district court adopted the magistrate judge's findings and recommendations in their entirety.

Third, in October 2017—following the Legislature's enactment in 2016 of an amendment to section 1473 adding new subdivision (b)(3), which revised the applicable standard for showing entitlement to relief based on "[n]ew evidence" that would have "more likely than not changed the outcome at trial"—Henry filed a habeas petition in the Solano County Superior Court, seeking relief based on newly discovered evidence (i.e., the evidence developed in the proceedings discussed above).[5] The superior court issued an order to show cause and held an evidentiary hearing in December 2019. The court considered Henry's claim for relief in light of the amendment to

---

[5] This was the third petition for habeas corpus attacking his conviction that Henry filed in the California courts. In 2013, Henry filed a habeas petition in Solano County Superior Court, arguing that new evidence developed at the 2009 federal hearing showed his actual innocence. The court denied that petition as untimely. A second petition was denied in 2016 as a successive petition.

section 1473 (effective January 1, 2017). Jeffrey testified that, after Henry was robbed, there was only a discussion of beating Turner up, not shooting or killing him. In addition, Jeffrey testified he was in the car with Brewer and Oden, and that Oden fired the shots at Johnson. Henry also testified in the evidentiary hearing held by the superior court. In part, he denied making the statement to the police, " 'I hired Lee Brewer to kill Cedric Turner. He . . . killed the wrong guy. I don't understand why I am being charged.' "

Another new piece of evidence, an enhanced audio recording of Jeffrey's interview by Detective Bawart and another detective in the investigation of Johnson's murder, emerged for the first time at the 2019 hearing. The enhanced audio recording (which was enhanced by a forensic video and audio analyst in 2019 at the request of Henry's superior court habeas counsel) was not considered in the trials of Henry's accomplices or in the federal habeas proceedings. On the recording, Jeffrey is asked what Brewer said when he was told he shot the wrong man; in response, Jeffrey can be heard saying that Brewer said Johnson "was talking a mile a minute and [] pulled out a gun." The transcript of the unenhanced version of the recording, which was used to refresh Detective Bawart's recollection when he testified at Henry's 1986 trial, omits some of this language, and the statement that Johnson "pulled out a gun" was not in evidence at the 1986 trial. Henry argues the new evidence that Brewer said Johnson had a gun bolsters the view that Brewer had an independent reason for shooting Johnson that had nothing to do with an agreement between Brewer and Henry.

On December 30, 2019, the superior court issued an order denying relief. Like the federal district court, the superior court found in part that Henry's new evidence was not credible. Henry's superior court habeas counsel filed a notice of appeal in January 2020. This court dismissed that appeal (No. A159396) because the superior court's denial of habeas relief is

10

not an appealable order. (*People v. Henry* (Sept. 18, 2020, A159396) [nonpub. opn.].) On July 31, 2020, after appointment of appellate counsel, Henry filed the original habeas proceeding that is now before us.

**C.** ***The Claims Alleged in Henry's Petition and Our Order To Show Cause of May 25, 2021***

Henry now alleges he is entitled to habeas relief based on "new evidence" (mostly the evidence developed in the prior proceedings) and the presentation of "false evidence" at his 1986 trial (a ground for relief not raised in his prior habeas petitions). In the memorandum attached to his petition, Henry states he is presenting the following eight claims:

"(1) that [Henry] is entitled to relief based upon newly discovered evidence that Oden, rather than Brewer, was the person who shot Johnson, which is evidence that Johnson was not shot because [Henry] had hired Brewer to shoot [Turner];

"(2) that [Henry] is entitled to habeas corpus relief because false evidence was introduced at [his] trial that it was Brewer who shot Johnson, which supported the prosecution's theory that [Henry] had hired Brewer to shoot Turner but Brewer shot Johnson in the mistaken belief that Johnson was Turner;

"(3) that [Henry] is entitled to habeas corpus relief based upon newly discovered evidence that Brewer was familiar with both Turner and Johnson at the time of the shooting and therefore would not have mistaken Johnson for Turner;

"(4) that regardless of whether it was Brewer or Oden who shot Johnson, [Henry] is entitled to habeas corpus relief based upon newly discovered evidence that [Oden and Brewer each] had a reason to shoot Johnson based upon Johnson's statements and behavior at the scene of the shooting, rather than an alleged agreement with [Henry] to commit the shooting;

11

"(5) that [Henry] is entitled to habeas corpus relief based upon false evidence that he had entered into an agreement to pay Brewer to shoot [Turner];

"(6) that [Henry] is entitled to habeas corpus relief based upon newly discovered evidence that Oden believed Johnson had a gun, which gave Oden a reason to shoot Johnson that had nothing to do with an alleged agreement with [Henry];

"(7) that [Henry] is entitled to habeas corpus relief based upon newly discovered evidence that Brewer saw Johnson pull out a gun right before Brewer shot Johnson, which gave Brewer his own reason to shoot Johnson— rather than an agreement with [Henry]; [¶] and

"(8) that [Henry] is entitled to habeas corpus relief based upon false evidence that Brewer had only mentioned 'talking a mile a minute' before Johnson was shot when Brewer also had stated that Johnson pulled out a gun, which gave Brewer a reason to shoot Johnson that had nothing to do with an alleged agreement with [Henry]."

Our order to show cause, filed May 25, 2021, was limited to: (1) Henry's claims for relief based on newly discovered evidence under section 1473, subdivision (b)(3); and (2) his claims for relief—on grounds of both "false evidence" and "new evidence" (§ 1473, subds. (b)(1), (3))—based on the enhanced audio recording that was admitted into evidence at the superior court evidentiary hearing in 2019. We specifically stated that our order to show cause "does not extend to the remaining 'false evidence' claims asserted in the petition because those claims are untimely" and that "[a]side from the claims that are the subject of [our] order to show cause, the petition is denied." Thus, claims 2 and 5—both "false evidence" claims that are not based on the enhanced audio recording—are outside the scope of the order, and relief on them has already been denied.

12

# III. DISCUSSION

The claims in Henry's petition that have not already been denied break down into one of two categories. First, Henry pleads claims alleging a variation on the theories that Oden, not Brewer, shot Johnson; that Brewer could not have mistaken Johnson for Turner because he was familiar with Johnson and Turner, and thus Brewer must have had his own reasons to shoot Johnson; and that there was no murder for hire agreement between Henry and Brewer. Second, Henry pleads claims alleging that Brewer was motivated to shoot Johnson because of Johnson's threatening behavior and therefore Brewer did not carry out the shooting pursuant to any murder for hire agreement.

## A. *Claims Based on Evidence Other Than the Enhanced Audio Recording*

Falling in the first category are claims 1, 3, 4—in part (to the extent it is premised on the allegation that Oden was the shooter)—and 6. As Henry acknowledges in his petition, these claims all rest on evidence that surfaced years ago in the trials of Henry's alleged accomplices or in the federal habeas proceeding. They all fail on one or both grounds that they are untimely (*In re Reno* (2012) 55 Cal.4th 428, 460–463) or that they are not subject to section 1473, subdivision (b)(3) because the statute covers only claims based on evidence that is both "new" and "credible."

Here, we will defer to prior adverse credibility findings in previous habeas proceedings. When a habeas claim comes to us in original proceedings following a previous habeas proceeding on the same claim in the superior court, we may defer to the findings of the superior court where those findings turned on an assessment of credibility. "While our review of the record is independent and 'we may reach a different conclusion on an independent examination of the evidence . . . even where the evidence is conflicting' [citation], any factual determinations made below 'are entitled to

great weight . . . when supported by the record, particularly with respect to questions of or depending upon the credibility of witnesses the [superior court] heard and observed.' " (*In re Resendiz* (2001) 25 Cal.4th 230, 249 (lead opn. of Werdegar, J.).)[6] We see no reason the same principle ought not to apply to a prior determination made on habeas claims in federal court.

The key witnesses supplying evidence that Oden, not Brewer, shot Johnson, that there was no murder for hire agreement to kill Turner, and that Brewer would not have mistaken Johnson for Turner, are Jeffrey, Brewer, and Henry himself.[7] The testimony proffered from each of these three witnesses has repeatedly been found not credible in prior habeas proceedings. (*Henry v. Marshall*, *supra*, 2010 U.S. Dist. LEXIS 52192, at pp. *29–*50, *70–*72.) On the various occasions Jeffrey made statements to the police and testified about the murder of Johnson, Jeffrey's versions of events were, to put it mildly, all over the lot. He initially told Detective Bawart he was 90 feet away from the shooting and did not see it happen. Then, at trial, he testified that he had lied about some issues in his police

---

[6] Justice Mosk concurred in the relevant portion of Justice Werdegar's lead opinion in *Resendiz*. (See *In re Resendiz*, *supra*, 25 Cal.4th at p. 255 (conc. & dis. opn. of Mosk, J.).)

[7] Henry cites and relies upon testimony given after his trial from various others, including Charles Austin and Pamela Conyers, but we view all of that testimony as "merely cumulative, corroborative, [or] collateral" to the evidence that was presented at Henry's trial. (§ 1473, subd. (b)(3)(B).) None of it constitutes "new evidence" within the meaning of section 1473, subdivision (b)(3). In addition, the federal magistrate judge found there were problems with Conyers's credibility because she recanted part of her prior statement to an investigator (*Henry v. Marshall*, *supra*, 2010 U.S. Dist. LEXIS 52192, at pp. *64–*65), and found credibility problems with Austin's testimony as well (*id.* at pp. *50–*53). The superior court similarly found that "[t]he admitted transcripts of Pamela Conyers and Charles Austin add little to this factual analysis and are not supported by the additional evidence presented to this Court."

14

interview, that he was at the scene of the shooting, and that he saw Oden fire the shots from the driver's window of a blue car Brewer was driving. Then, at Brewer's trial, he testified he was in the backseat of the blue car when Oden fired the shots.

These are just some of the most glaring inconsistencies in Jeffrey's testimony about the circumstances of Johnson's murder. There were a number of others. (*Henry v. Marshall, supra*, 2010 U.S. Dist. LEXIS 52192, at pp. *32–*40.) To explain all of these discrepancies, Henry argued that Jeffrey, a youth of 16 at the time of the Johnson murder, was intimidated in his police interview and did not want to identify Oden as the shooter due to fear of retaliation. (*Id.* at p. *40.) But the magistrate judge found neither explanation persuasive. (*Id.* at pp. *40–*42.) He summed up his assessment of Jeffrey's credibility as follows: "Not only [were] Jeffrey's varying accounts wildly inconsistent, and his memory repeatedly unreliable, his demeanor at the evidentiary hearing was not at all convincing. He repeatedly stated that he did not remember various details of the shooting, only to claim that he remembered them once he had reviewed his previous testimony in which he gave varying accounts. It was apparent that what he struggled to remember was what he previously had said in prior testimony. The more probable explanation for Jeffrey's inability to recall who fired the gun is the account that he first told the police; he was not in the car at the time and did not see who did the shooting. Also, as [Henry's] brother, Jeffrey clearly has a motive for fabrication. The court finds that Jeffrey is not a credible witness." (*Id.* at pp. *45–*46.)

Jeffrey testified again in the 2019 evidentiary hearing on Henry's subsequent habeas petition in superior court. There, the superior court found that the evidence presented by Henry was "not, by and large, new evidence," and noted Jeffrey testified at Henry's original trial. With respect to Jeffrey's

15

credibility, the court noted that the key witnesses (Henry, Jeffrey, and Brewer) testified to inconsistent versions of events, and the magistrate judge in the prior federal habeas proceeding found this evidence not credible. We, too, will defer to the assessment of the magistrate judge as adopted by the federal district court in 2010 that Jeffrey, who has a filial bias in favor of Henry, is not believable. (*Henry v. Marshall*, *supra*, 2010 U.S. Dist. LEXIS 52192, at p. *46.)

Brewer's version of events also suffers from credibility problems. After exercising his right to remain silent when Henry was tried, at his own trial, and for many years thereafter, Brewer testified about the murder of Johnson for the first and only time in the federal habeas evidentiary hearing in 2009. There, he testified that Henry did not hire him, or offer him money or drugs, to hurt or kill Turner; that Oden shot Johnson; that Brewer was familiar with Turner and Johnson (although he did not know them well) and would not have mistaken one for the other; that Jeffrey was in the car with Brewer and Oden; that Brewer and Oden went to Jester's house the day after the shooting; and that Brewer did not see Henry there. The magistrate judge found Brewer's testimony was not credible because it contained internal inconsistencies; because Brewer's claim that he was never offered drugs to beat up or kill anyone is inconsistent with Henry's claim that he offered Brewer drugs to beat up Turner; that Brewer has a motive to say Oden is the shooter, to take blame off himself; and that Brewer was impeached by prior felony convictions. (*Henry v. Marshall*, *supra*, 2010 U.S. Dist. LEXIS 52192, at pp. *46–*50.) We will defer to the magistrate judge's assessment of Brewer's credibility.

Henry, for his part, exercised his privilege to remain silent at his own trial, and eventually decided to testify about Johnson's murder for the first time at the federal evidentiary hearing. He testified that after being robbed

16

the night before the murder, he discussed retaliating against Turner with Jeffrey and Jester, but that they only discussed beating Turner up (not shooting or killing him). He testified that he jokingly said to Brewer he would give him some cocaine if he helped beat up Turner, but neither Henry nor Brewer took the offer seriously. The magistrate judge did not make the same type of detailed explicit credibility findings about Henry that he did about Jeffrey and Brewer. But the magistrate judge did note that Henry made highly incriminating statements to the police about having hired Brewer to kill Turner, and to the extent he provided testimony attempting to explain away these statements, the credibility of that testimony was undercut by his inconsistent statements and by inconsistencies between his and Brewer's testimony. (*Henry v. Marshall, supra*, 2010 U.S. Dist. LEXIS 52192, at pp. *66–*72.)

Henry testified again about Johnson's murder in the evidentiary hearing held by the superior court. There, he testified that after he was robbed by Shellmon, he talked with Jester and Jeffrey about beating Turner up, but not about shooting or killing him; in the late afternoon, Brewer and Oden came by Jester's house; in the presence of Brewer and others, Henry "threw out" a statement that he would give a couple rocks of cocaine to anyone who would help beat up Turner ("kick his ass"); there was no discussion of shooting or killing Turner; no agreement was reached with Brewer; later at the scene of the shooting, Henry saw the barrel of a gun come out the passenger side of Brewer's car, and shots were fired; and he was not present at any meeting with Brewer the day after the shooting. Henry specifically denied making the statement to the police (after the tape recording was turned off), " 'I hired Lee Brewer to kill Cedric Turner. He . . . killed the wrong guy. I don't understand why I am being charged.' " Instead, he testified that the police were speaking in hypotheticals and Henry asked:

17

" 'How can I be guilty of murder if I hired Brewer and he shot somebody else?' " As to his incriminating statements that *were* on the recording of his interview, Henry said the police asked compound questions and he just answered the last part; he did not intend to concede he hired Brewer to kill Turner.

As to Henry's credibility, the superior court found that (1) he could have testified at trial but chose not to; (2) his testimony in the 2019 hearing was "inconsistent with his recorded interview with Detective Bawart (notwithstanding admitted errors in the proffered transcript), his previous testimony in 2009, and his own verified factual summary in support of his writ"; (3) his 2019 testimony was also inconsistent with Jeffrey's various statements and testimony, and with Brewer's testimony at the federal hearing; (4) Henry presented much of the same evidence at the federal hearing, and the federal magistrate judge found it not credible.

None of Henry's testimony in either of these two prior habeas proceedings can be considered "new," since he elected to withhold it at his trial. And even if Henry's testimony qualifies as "new" within the meaning of section 1473, subdivision (b)(3)(B) when evaluated in the context of testimony from others that does meet that standard, we agree with the assessments of the magistrate judge and the superior court that Henry's testimony conflicts with his own prior statements, with his prior testimony, and with the testimony of Jeffrey and of Brewer. (See *Henry v. Marshall*, *supra*, 2010 U.S. Dist. LEXIS 52192, at pp. *70–*72.) In light of the inherently self-serving bias Henry has, and giving great weight to the adverse credibility findings against Henry by both the magistrate judge and the superior court, we find his proffered testimony in this proceeding to be neither "new" nor "credible." (§ 1473, subd. (b)(3).)

18

Accordingly, we conclude that none of claims 1, 3, 6, or 4 (to the extent it alleges Oden was the shooter) is covered by section 1473, subdivision (b)(3) and that, insofar as those claims are based on a request for habeas relief outside of that particular statutory subdivision, they are untimely. All that remains are the claims alleging that, based on the enhanced audio recording Henry alleges was unavailable to him prior to 2019, Brewer shot Johnson because of Johnson's belligerent conduct, not pursuant to a murder for hire agreement (claims 7 and 8 and that portion of claim 4 premised on the allegation that Brewer was the shooter). We now turn to those claims.

**B.** *Claims Based on the Enhanced Audio Recording*

We asked the parties to submit supplemental briefing on the question whether Henry's claims based on the enhanced audio recording are timely. Having reviewed the parties' submissions, we shall assume arguendo that these claims are timely and proceed to resolve all of them on the merits.

Claim 7 and the portion of claim 4 that we consider here are newly discovered evidence claims, while claim 8 is a false evidence claim. The applicable legal standards governing these two types of claims are different. Habeas corpus relief based on newly discovered evidence may be granted when "[n]ew evidence exists that is credible, material, presented without substantial delay, and of such decisive force and value that it would have more likely than not changed the outcome at trial." (§ 1473, subd. (b)(3)(A); *In re Masters* (2019) 7 Cal.5th 1054, 1081 (*Masters*).) The statute defines " 'new evidence' " to mean "evidence that has been discovered after trial, that could not have been discovered prior to trial by the exercise of due diligence, and is admissible and not merely cumulative, corroborative, collateral, or impeaching." (§ 1473, subd. (b)(3)(B).) Prior to the 2016 legislation (effective January 1, 2017) that added these provisions to section 1473 (Stats. 2016, ch. 785, § 1), the standard for relief based on newly discovered evidence was

more stringent.  "[A] habeas corpus petitioner proceeding on this ground had to show the new evidence pointed ' "unerringly to innocence" ' and 'undermine[d] the entire case of the prosecution.'  (*In re Hall* (1981) 30 Cal.3d 408, 423.)  That former standard required a petitioner to conclusively establish innocence.  (*Ibid*.)"  (*In re Sagin* (2019) 39 Cal.App.5th 570, 579.)

A different standard applies to claim 8, the false evidence claim.  A 1975 amendment to Penal Code section 1473 set forth in substance the current standard for false evidence claims, providing that habeas relief is available if "[f]alse evidence that is *substantially material or probative on the issue of guilt or punishment* was introduced against a person at a hearing or trial relating to the person's incarceration."  (§ 1473, subd. (b)(1), italics added; see *In re Wright* (1978) 78 Cal.App.3d 788, 807–808.)  "The remedial purpose of the statute is to afford the petitioner relief if the 'false evidence [was] of such significance that it may have affected the outcome of the trial . . . .' "  (*In re Richards* (2016) 63 Cal.4th 291, 312.)  " 'Determining that the evidence was false clears the first hurdle to relief.  "The statute and the prior decisions applying section 1473 make clear that once a defendant shows that false evidence was admitted at trial, relief is available under section 1473 as long as the false evidence was 'material.' " [Citation.]  Materiality is shown if there is a reasonable probability the result would have been different without the false evidence.' [Citation.]  'This required showing of prejudice is the same as the reasonably probable test for state law error established under *People v. Watson* (1956) 46 Cal.2d 818, 836.  [Citation.]  We make such a determination based on the totality of the relevant circumstances.' " (*Masters*, *supra*, 7 Cal.5th at p. 1078.)

We need not delve into subtle differences between these two standards because Henry cannot meet the prejudice element of either one.  The question here is whether we are prepared to say Jeffrey's unsworn statement to

20

Detective Bawart that Brewer said Johnson pulled out a gun is "of such decisive force and value that it would have more likely than not changed the outcome at trial" (§ 1473, subd. (b)(3)(A)), or that it was " ' " 'material' " ' " in the sense that, in the totality of the circumstances without the allegedly false evidence (i.e., the allegedly incomplete description of Brewer's statement that was in evidence at trial), " 'there is a reasonable probability the result would have been different' " (*Masters*, *supra*, 7 Cal.5th at p. 1078). For two reasons, we think not.

First, because Jeffrey is the only witness who is alleged to have said anything about Brewer believing Johnson pulled a gun, the credibility of his statement on this point is bound up with Jeffrey's credibility in general, and in our view Jeffrey is the least believable of any witness Henry relies upon. When Brewer finally testified about the murder of Johnson, not even he said that Johnson engaged in the provocative act of pulling a gun. Brewer's version of what happened was simply that Oden shot Johnson. Brewer gave no explanation for why Oden killed Johnson; he just laid the blame on Oden, and denied being party to any murder for hire agreement. There was evidence at trial—corroborated by Henry's statements to police—of a quid pro quo agreement between Henry and Brewer to harm Turner. There was also strong evidence of conduct by Brewer both before the shooting (arming himself with a rifle and driving to the location where Turner was) and in its aftermath (trying to collect for what he had done) showing that the object of the agreement was to do more than administer a beating. The evidence at trial also included testimony from Jeffrey that 15–20 minutes before the shooting he, *Jeffrey*, saw Johnson in possession of a chrome gun, that the gun was tucked in Johnson's rear waistband, and that Johnson pulled it out of his waistband and then stuck it back in. Jeffrey's belief that Johnson had a gun well before the shooting obviously proves little or nothing about what *Brewer*

21

saw or was thinking when the shooting took place. We think it implausible that any rational juror would accept a double hearsay statement in which Jeffrey attributes to Brewer a belief about Johnson pulling a gun just before being shot—an observation no witness testifying from personal knowledge, including Jeffrey himself, ever made—and then rely on that sliver of hearsay to justify the conclusion that Brewer shot Johnson for his own reasons rather than by mistake in the course of executing his assigned task.

Second, the nature of the "proof" Henry now relies upon must be kept in mind. We are dealing with an unsworn interview statement that, at Henry's trial, the prosecutor used in an effort to refresh Detective Bawart's recollection of hearsay statements allegedly made by Brewer. After Detective Bawart reviewed the specific portion of the statement that mentions the word "guns," his memory of what Jeffrey said in the interview about Brewer's statements did not include anything about "guns." (He recalled the part about "talking a mile a minute" but nothing about "guns.") Henry's counsel never tried to offer the transcript itself into evidence, presumably because it included many statements that inculpated Henry in various ways, including Jeffrey's admission that he believed there was a quid pro quo agreement with Brewer (although he denied being present when it was reached), that Henry was present when Brewer came to collect the next day, that Henry offered to pay a discounted amount ($100) for the botched attempt at murder, and that Henry brought guns to the confrontation with Turner. The idea that, had the transcript been more complete, Detective Bawart's recollection would have been any clearer, or that competent defense counsel would have offered the enhanced transcript into evidence, is sheer speculation. And in any event, Henry presented expert testimony and argued from it that Turner was not in Brewer's line of fire when Johnson was shot, and thus that Johnson—who suffered multiple gunshot wounds—must have been shot intentionally for

22

some reason other than an attempt to murder Turner. In the absence of corroborating testimony from Brewer himself about what was going through his mind, Jeffrey's hearsay statement that Brewer said Johnson pulled out a gun is attenuated proof of intent at best and adds very little to the physical evidence Henry's counsel already had available to rely upon in closing at trial.

Henry has pointed to none of the traditional indicia suggesting that, in convicting him, his jury saw his case as close (e.g., split verdict, lengthy deliberations, reported impasse, questions to the trial judge suggesting it was struggling with the issue of transferred intent). We acknowledge and find it understandable that from his perspective as an LWOP defendant, having seen Brewer succeed in convincing a later jury to return a second degree murder verdict with no finding of personal use of a firearm, Henry may be convinced he, too, could have been more persuasive in arguing Brewer's intent and role in the murder of Johnson. But we are not empowered to equalize the results coperpetrators obtain from separate juries on different occasions and different records. In this proceeding, we are focused on Henry's jury, Henry's trial record, and whether there is reason to believe the enhanced audio recording Henry relies upon in his claims 7, 8 and 4 (to the extent premised upon Brewer as the shooter) would have brought about a better result for him had that piece of evidence been a part of Henry's trial record. All in all, we must say no. The enhanced audio recording is not "[n]ew" evidence of such "decisive force and value that it would have more likely than not changed the outcome at trial." (§ 1473, subd. (b)(3)(A).) Nor is it material in the sense there is a reasonable probability the result would have been different had the enhancement been available at trial. (*Masters*, *supra*, 7 Cal.5th at p. 1078.)

23

## IV. DISPOSITION

The petition for a writ of habeas corpus is denied.

STREETER, Acting P. J.

WE CONCUR:

TUCHER, J.[*]
BROWN, J.

---

[*] Presiding Justice of the Court of Appeal, First Appellate District, Division Three, sitting by assignment pursuant to article VI, section 6 of the California Constitution.